UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT


VU TAM,                      :
        Plaintiff,           :
                             :
    v.                       :     Case No. 3:12-cv-1019(DJS)
                             :
BARBER LaFRANCE, et al.,     :
        Defendants.          :


RULING ON MOTION FOR SUMMARY JUDGMENT [Doc. #33]

The plaintiff, Tam Vu,[1] is confined at the MacDougall-Walker
Correctional Center.  He brings this civil rights action for
deliberate indifference to serious medical needs against
Utilization Review Committee members Drs. Ruiz, Naqvi,[2] Farinella
and Wu ("the defendants").  Claims against Medical Supervisor
LaFrance were dismissed on August 20, 2012.  The defendants have
filed a motion for summary judgment.  For the reasons that
follow, the motion for summary judgment is granted.

---

[1]Department of Correction records indicate that the
plaintiff's name is Tam Vu.  During his deposition, the plaintiff
confirmed that his first name is Tam and his last name is Vu.
See Doc. #33-2 at 15.  In the case caption of the original
complaint, the plaintiff indicated his name as Vu, Tam and signed
the complaint Tam Vu.  The Clerk, however, entered the name as Vu
Tam.  On the amended complaint the plaintiff omitted the comma in
the case caption, listing his name as Vu Tam, but again signed
his name as Tam Vu.  In this ruling, the court uses the
plaintiff's correct name, Tam Vu.

[2]The plaintiff incorrectly identified this defendant as Dr.
Haqui in the amended complaint.

I.   <u>Standard of Review</u>

A motion for summary judgment may be granted only where there are no issues of material fact genuinely in dispute and the moving party is entitled to judgment as a matter of law.  <u>See</u> Rule 56(a), Fed. R. Civ. P.; <u>In re Dana Corp.</u>, 574 F.3d 129, 151 (2d Cir. 2009).  The moving party may satisfy his burden "by showing - - that is pointing out to the district court - - that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks and citations omitted).  Once the moving party meets this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  <u>Wright v. Goord</u>, 554 F.3d 255, 266 (2d Cir. 2009).  He must present such evidence as would allow a jury to find in his favor in order to defeat the motion for summary judgment.  <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).  Merely verifying conclusory allegations of the complaint in an affidavit, however, is insufficient to oppose a motion for summary judgment.  <u>Zigmund v. Foster</u>, 106 F. Supp. 2d 352, 356 (D. Conn. 2000).

When reviewing the record, the court resolves all ambiguities and draws all permissible factual inferences in favor of the party against whom summary judgment is sought.  <u>Loeffler v. Staten Island Univ. Hosp.</u>, 582 F.3d 268, 274 (2d Cir. 2009).

If there is any evidence in the record on a material issue from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is inappropriate.  Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).  However, the existence of a mere "scintilla" of evidence supporting the plaintiff's position is insufficient to defeat a motion for summary judgment.  Harvey v. Homebound Mortgage, Inc., 547 F.3d 158, 163 (2d Cir. 2008).

II.  Facts

The facts are taken from the defendants' Local Rule 56(a)1 Statement and the exhibits attached to the complaint and motion for summary judgment.  Local Rule 56(a)2 requires the party opposing summary judgment to submit a Local Rule 56(a)2 Statement which contains separately numbered paragraphs corresponding to the Local Rule 56(a)1 Statement and indicates whether the opposing party admits or denies the facts set forth by the moving party.  Each denial must include a citation to an affidavit or other admissible evidence.  In addition, the opposing party must submit a list of disputed factual issues.  See D. Conn. L. Civ. R. 56(a)2 & 56(a)3.

Despite receiving notice of his obligation to respond to the motion for summary judgment and the contents of a proper response, the plaintiff did not submit a Local Rule 56(a)2 Statement.  There is a section of the plaintiff's memorandum

3

entitled "Disputed Issues of Material Fact." The plaintiff includes citations to "Id" in that section, but he does not identify the document to which he refers. That section also cites to certain exhibits that are attached to his memorandum, but those exhibits do not include an affidavit or other admissible evidence that would support his contention of disputed issues of material fact. In the absence of a citation to admissible evidence documenting a dispute over a fact, the defendants' properly supported facts are deemed admitted. See D. Conn. L. Civ. R. 56(a)1 ("All material facts set forth in said statement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2.").

Before coming to Connecticut, the plaintiff was incarcerated in New York where he underwent surgery in August 2008 to remove a non-malignant brain tumor.  Following the surgery, the plaintiff complained about difficulty swallowing and eating and experienced progressively worsening double vision.  In November 2008 the plaintiff underwent throat surgery.  He received no further surgery on his eyes or throat while incarcerated in New York and filed no complaints about his medical care there.

The plaintiff was transferred to Connecticut in January 2010.  The plaintiff is not scheduled to be released from custody until August 2026.

In the Connecticut Department of Correction, health care within the correctional facilities is provided by doctors and nurses employed by the University of Connecticut Health Center. The plaintiff is confined at MacDougall-Walker Correctional Institution ("MacDougall"), the facility with the Department of Correction's most advanced infirmary.  When an inmate might require care that cannot be provided in the correctional facility, doctors submit a request to the Utilization Review Committee ("URC"), a panel of doctors who review requests state-wide to ensure consistency of care and evaluate the medical necessity of the requested treatment.

During the time pertinent to this action, Drs. Naqvi, Farinella, Ruiz and Buchanan served on the URC.  Dr. Maurer assisted Dr. Buchanan.  Dr. Wu was not a member of the URC during this time.  Dr. Naqvi also served as the plaintiff's treating physician at the correctional facility, however, he is named in this action only as a member of the URC.

Upon his arrival in Connecticut on January 12, 2010, the plaintiff told the intake nurse that he suffered from arthritis, a history of back pain and a history of smoking and drug abuse. He made no reference to complaints regarding his eyesight, swallowing, breathing or hearing.  He did not indicate that he needed to see a doctor.

On January 19, 2010, the plaintiff was seen by medical staff

at the Bridgeport Correctional Center for a regular visit.  He
told medical staff that he had headaches and had undergone
surgery.  He was provided pain medication and signed a release to
enable medical staff to obtain his New York medical records.  Two
days later the plaintiff was again seen by medical staff.  At
that time he explained what he understood of his health history
and it was noted that he had vision problems with his left eye.
The plaintiff sought, and was given, a bottom bunk pass.

Two weeks after his admission, the plaintiff was transferred
from the Bridgeport Correctional Center to MacDougall.  He signed
another release and staff requested his New York records.  At
that time a notation was entered on his record indicating that a
doctor's appointment should be scheduled for him when his New
York records arrived.  The plaintiff saw a doctor on January 28,
2010, before his medical records arrived.  He was unable to tell
the doctor what type of brain tumor had been removed in New York
and was unable to indicate the results of an MRI that had been
performed. He stated only that the New York doctors had said
something was wrong.

At the end of January and again on February 11, 2010, the
plaintiff asked to see a doctor because he had pain in his brain,
neck and head.  The plaintiff was seen by health staff on
February 14, 2010.  The plaintiff attributed his pain to his
surgery.  Medical notes indicate that the plaintiff's medical

6

records had not yet arrived from New York.  He was given Motrin for the pain and his vital signs were checked.

In March 2010 the plaintiff asked to see a doctor because of pain in his left ear and head.  A nurse examined the plaintiff on March 28, 2010, for left ear pain which the plaintiff attributed to his surgery in 2008.  The nurse noted that an appointment with a doctor was scheduled for April.  None of the defendants were responsible for scheduling initial or routine doctor visits within a correctional facility.

Dr. Naqvi first saw the plaintiff on April 5, 2010.  The plaintiff complained of experiencing intermittent headaches and an itch in his left eye.  Dr. Naqvi treated those complaints by prescribing Motrin and an antihistamine.  He also instructed the nurse to follow up on the request for the plaintiff's New York medical records.  The plaintiff refused to take the antihistamine.  Later in April the plaintiff was seen for cold symptoms.

In May 2010, the plaintiff was seen for acne.  At that time the nurse obtained another request for medical records and referred the plaintiff to the doctor, noting that his ear was slightly red and irritated.  The plaintiff reported ear pain on June 21, 2010, and Dr. Naqvi saw him two days later.  The plaintiff's 2008 surgery had caused hearing loss in his left ear. The plaintiff complained of left ear and neck pain.  Dr. Naqvi

prescribed Elavil for the pain and told the plaintiff that he needed the plaintiff's New York medical records before he could make any further appointments. Dr. Naqvi indicated that the New York records were necessary because it was difficult to treat the plaintiff without more specific information and because the plaintiff was a poor historian.

On June 28, 2010, the plaintiff was seen by a nurse on an emergency sick call. The plaintiff complained that he had been dizzy for several days, vision in his right eye was blurry and he felt nauseous. He told the nurse that doctors in New York had told him he had a second tumor on the right side of his head and that he feared the tumor might have grown. Nothing was apparent on physical examination. The nurse gave the plaintiff Milk of Magnesia and followed up again regarding the New York medical records.

On June 29, 2010, the plaintiff sent a letter requesting to see a doctor, stating that he felt the same way he had in 2008 before the tumor was discovered. The plaintiff also stated that he was experiencing head pain. Nursing staff did not act on this request. Members of the URC did not receive a copy of this letter, nor was Dr. Naqvi aware of it at the facility.

On August 15, 2010, a nurse noted on the plaintiff's chart that she was making an appointment with a doctor and that the New York medical records still had not arrived. On August 22, 2010,

the plaintiff asked to be seen by a nurse for left ear pain and itchy eyes.  Dr. Naqvi saw the plaintiff the following day.  Dr. Naqvi noted that the New York medical records still had not been received.  The plaintiff only complained of an earache and itchy eyes.  Dr. Naqvi prescribed Cipro, an antibiotic, and Benadryl for itchiness.

On September 6, 2010, the plaintiff met with a nurse regarding ear pain.  He reported that he had taken the antibiotic and that Motrin did not relieve the pain.  The nurse noted no irritation, wax build up or sign of infection in the plaintiff's ear, but indicated that she would refer the plaintiff to the prescriber, Dr. Naqvi. On September 11, 2010, the plaintiff had swelling in his ear and was again seen by a nurse. On that occasion he acknowledged that he had put rolled up toilet paper in his ear to clean it.  On September 13, 2010, Dr. Naqvi saw the plaintiff for ear pain.  Dr. Naqvi noted an extreme ear infection and prescribed Cortisporin, a combination steroid and antibiotic.

The New York medical records arrived in November 2010.  The records revealed the following information.  In December 2008, four months after the brain surgery, the doctor noted that the plaintiff had hearing loss in his left ear, a deviation in his palate and mild left tongue atrophy.  The plaintiff complained of diplopia [double vision] when he looked to the left.  The plaintiff had no other complaints.  He denied headaches, nausea,

vomiting, weakness, numbness, difficulty breathing, speaking or swallowing.  The doctor noted that the plaintiff's speech was mildly affected by his neurological issues but there were no issues of immediate concern.  The only follow-up noted was an MRI the plaintiff was to have in August 2009.

A week after the medical records arrived, the plaintiff reported to sick call complaining of pain in his head.  To Dr. Naqvi's knowledge, this was the first complaint of head pain or headaches since April 2010.  The plaintiff did not complain of difficulty breathing or double vision.  The nurse explained to the plaintiff the process of obtaining an out-of-facility consult and stated that she would refer the New York medical records to a doctor for review.

Two days later, on November 18, 2010, Dr. Naqvi submitted a URC request for an MRI of the plaintiff's brain.  The request noted the plaintiff's recurrent headaches and ear infections, his history of brain surgery and his questions whether his current symptoms were related to the past disease.  The onset date for the condition was listed as unknown.  The plaintiff's medical records were submitted with the request.  The request was not labeled a rush as the plaintiff did not have any urgent issues and the New York records recommended the MRI as a follow-up to the surgery.  The URC approved the procedure and scheduled the MRI for January 10, 2011.  The MRI was rescheduled due to snow

and completed on February 9, 2011.

In December 2010, while this request was pending, the plaintiff was involved in an altercation resulting in contusions about the face and head, inability to fully open his mouth and a bloody nose.  A second URC request was submitted, this time for an emergency room consult.  The request was approved retroactively.  Dr. Farinella had ordered the plaintiff transported to the University of Connecticut Medical Center for emergency treatment after the altercation.  At this time the plaintiff complained of an inability to swallow. This was the first time he had made such a complaint since his transfer to Connecticut in January 2010.

 Two days after the altercation the plaintiff complained of pain in his eyes.  He was prescribed pain medication and antibiotics for a nasal fracture.  The following day, an ophthalmology consult was requested as a follow-up to the emergency room visit.  The URC request specified the date of the altercation as the date of the incident or onset of the issue. The request sought an ophthalmology consult if the plaintiff's vision changed within the next week.  The URC approved the request.

Dr. Naqvi saw the plaintiff on January 11, 2011.  He prescribed Motrin because the plaintiff's chest remained tender after the assault and noted that the plaintiff had been scheduled

for an optometry appointment.

The plaintiff's MRI was performed on February 9, 2011.  On February 13, 2011, the plaintiff reported to sick call and asked for the MRI results to be explained to him.  For the first time, the plaintiff stated that he believed he was supposed to get a hearing aid.  Also for the first time since his transfer to Connecticut, the plaintiff complained of double vision.

Dr. Naqvi saw the plaintiff on February 14, 2011.  The plaintiff stated that he experienced dizziness, hearing loss and double vision since his brain surgery.  The plaintiff had not previously complained to Dr. Naqvi about double vision.  Dr. Naqvi noted that it was difficult to compare the new MRI to the previous one, even though both were taken after the brain surgery, because the previous MRI did not have all of the dimensions of the area of the brain in question.  The new MRI did not indicate to Dr. Naqvi any urgent need for neurological care.  Dr. Naqvi noted that the plaintiff needed a hearing test and an ophthalmology consult.

The following day, the plaintiff was seen by an optometrist and prescribed glasses with prisms to help correct his double vision.  The plaintiff told the optometrist that he had been scheduled for surgery in New York to correct the double vision.  No scheduled surgery is evident from any of the New York medical records sent to Connecticut. On June 28, 2011, the plaintiff met

with an optometrist who at that time determined that the glasses ordered in February 2011 had been made incorrectly by the lab. Neither the URC nor Dr. Naqvi were informed of the error.

On April 7, 2011, the plaintiff requested examination by an ear, nose and throat ("ENT") doctor, stating that he had serious problems with his throat.  Dr. Naqvi saw the plaintiff on April 18, 2011.  The plaintiff told Dr. Naqvi that he had issues with eating and wanted something done to improve his voice and breathing.  Dr. Naqvi noted three complaints on this visit: nasal discharge when eating, double vision and issues with the plaintiff's voice.  Dr. Naqvi reassured the plaintiff regarding the nasal discharge and noted that the plaintiff's double vision was being treated by the optometrist with glasses.  Dr. Naqvi also noted that the plaintiff's breathing was fine and his voice intelligible, but a little breathy.  He questioned whether the plaintiff experienced vocal cord weakness as a result of his previous throat surgery.  This was the first time the plaintiff complained to Dr. Naqvi about issues involving eating, breathing or his throat.

On June 4, 2011, the plaintiff again requested an ENT visit for medical treatment for his throat.  When he was seen four days later, the plaintiff stated that from the time of his sentencing he was supposed to have surgery to open his airway.  Nothing in the New York medical records indicated that the plaintiff had

13

been scheduled for any surgery that had not been performed.

The ophthalmology consult approved by the URC was completed on June 21, 2011.  The ophthalmologist submitted a request that the plaintiff see a pediatric strabismologist, a children's doctor specializing in crossed eyes and other focus disorders. The ophthalmologist noted that the plaintiff had suffered from some level of double vision prior to his brain surgery and that he had a prescription for prism glasses.  The request was not identified as urgent and did not seek surgery.  The URC denied the request.  The University of Connecticut Medical Center did not have a pediatric strabismologist on staff and the consult would have required transportation to a private facility.  Noting that the plaintiff's vision was functional, the URC recommended an alternate plan, treatment with glasses and concluded that the requested service was not a medical necessity.  The plaintiff was unhappy with the decision and refused to sign an acknowledgment that he had received it.  Although he could have appealed the URC denial, the plaintiff did not do so.

On June 28, 2011, the optometrist told the plaintiff that the glasses ordered in February had been made incorrectly.  The plaintiff stated that he would wait to correct the glasses until he heard whether the URC would approve surgery for his eye muscles.

On June 15, 2011, Dr. Naqvi submitted a URC request for ENT

14

care for the plaintiff.  He sought a laryngoscopy to rule out vocal cord palsy in connection with hoarseness that the plaintiff had developed.  The URC approved the request and the ENT visit was held on August 17, 2011.

On August 1, 2011, the plaintiff filed a grievance against unidentified medical staff who allegedly told him that he would not be treated for his head, eyesight or hearing problems.  The plaintiff did not further specify his complaints in the grievance.  In response, a nurse told the plaintiff that he had been scheduled for a consultation with an ENT specialist at the University of Connecticut Health Center.  None of the defendants were involved in responding to the grievance.

On August 20, 2011, the plaintiff submitted an inmate request form stating that he had been told he would not receive treatment for his eye because the condition started before he came to Connecticut. In response, a nurse indicated that the plaintiff had been seen on September 16, 2011, and that paperwork had been submitted to the URC for reconsideration. On September 16, 2011, the plaintiff had met again with the optometrist who had previously treated him. Following this visit, the optometrist submitted a URC request that was described as a second request for corrective muscle surgery. The optometrist failed to note that the first request was for a strabismology consult, not surgery.  Relying on its previous determination that the

15

condition was mild and that the patient's vision was functional, the URC denied the request for surgery.  Dr. Naqvi conveyed the decision to the plaintiff.

The plaintiff was seen in the medical unit on October 20, 2011.  Records noted the recent ENT consult and the denial of the request for a strabismology consult.  The plaintiff was referred to a doctor for follow-up evaluation.  Dr. Pillai saw the plaintiff the same day.  He noted extra-ocular muscle palsy on the left side with motility (movement) problems and double vision in the left eye.  Dr. Pillai also noted that the ENT consultant recommended Prilosec, a heartburn medication.  Dr. Pillai reported that the plaintiff's New York medical records indicated that the plaintiff had undergone a long period of tube feeding and PEG feeding after the brain surgery, bypassing his throat. The ENT doctor who had seen the plaintiff wanted a follow-up with the plaintiff's medical records, so Dr. Pillai submitted a URC request for the consult.  This request was approved.

Dr. Pillai also submitted a second request seeking reconsideration of the decision denying the strabismology consult.  He noted that the plaintiff was claiming that, since 2008, he had left extra-ocular muscle motility disorder with left lateral and medial gaze palsy, crossed eyes and double vision. Relying on the previous rationale, the URC denied this request. Dr. Pillai explained the decision to the plaintiff who requested

16

that this denial be appealed.  The appeal noted significant double vision, a rationale not previously presented to the URC. During previous reviews, the panel understood the plaintiff's symptoms to be mild.  The appeal was approved in April 2012, and the plaintiff was subsequently scheduled for a strabismology consult.

The plaintiff had the second ENT consult in January 2012. The plaintiff underwent testing on his throat which showed excellent airway and inspiration.  The doctor noted that the plaintiff had good voicing with a defect to his vocal cords and a problem with phlegm.  The doctor recommended PRN care, i.e., as needed, and, if the plaintiff contracted an upper respiratory infection, careful control of mucus with fluids and a mucus-thinning agent.  There were no immediate physician orders or recommendations for care as a result of the second ENT consult. The plaintiff's medical records from New York and Connecticut include no recommendation for ENT surgery and no URC requests for ENT surgery were submitted to the panel.

In March 2012 the plaintiff reported for sick call complaining that he had no hearing in his left ear.  He stated that he lost hearing in his left ear after a procedure to his throat. The plaintiff requested a hearing aid.  Staff scheduled him to see a facility doctor.  Dr. Pillai ordered an appointment concerning the plaintiff's hearing.

17

Also in March 2012, the plaintiff sought medical clearance to be an inmate kitchen worker.  This position involved maneuvering around a kitchen with hot items, knives and people moving about as they worked. Dr. Pillai approved the plaintiff for this work assignment.

In April 2012 the plaintiff again saw the ophthalmologist who had first recommended the strabismology consult. On April 25, 2012, the ophthalmologist recommended that the plaintiff get glasses with prisms, reiterated his recommendation for a strabismology consult and requested a follow-up appointment in two or three months.  The URC approved the request for a follow-up visit.  For the first time, the URC request described the plaintiff's double vision as very bothersome.

The plaintiff suffers from paralytic diplopia (double vision) caused by loss of nerve functioning which leads to muscle paralysis. The course of paralytic diplopia is unpredictable. The condition could have improved, stabilized or, as in the plaintiff's case, worsened.  In the first year of his Connecticut incarceration, the plaintiff's double vision was considered mild and only worsened over time.

The ophthalmologist also submitted another URC request for a strabismology consult.  In light of the approval of the appeal, the URC approved this request on April 30, 2012.  The glasses with prisms were ordered the same day.  The URC panel was not

involved in scheduling the strabismology consult.  Other
personnel were corresponding with schedulers and the
ophthalmologist's office to schedule the visit.  Because there
was no strabismologist at the University of Connecticut Health
Center, issues of insurance, payment and security had to be
addressed before the consult could occur.

On June 29, 2012, the ophthalmologist submitted a URC
request for an MRI of the plaintiff's brain.  This request was
approved.  The plaintiff signed the acknowledgment that he
received the URC decision the day before he filed this lawsuit.
On June 29, 2012, the ophthalmologist also submitted a URC
request for the plaintiff to see a neuro-ophthalmologist.  The
strabismologist had requested that the plaintiff first see a
neuro-ophthalmologist who then would refer the plaintiff to the
strabismologist.  The URC approved this request on July 2, 2012.
The visit was scheduled by the neuro-ophthalmologist's office for
October 11, 2012.

The MRI was performed on July 24, 2012.  The plaintiff saw
the neuro-ophthalmologist on October 11, 2012.  Four days later,
the neuro-ophthalmologist described the plaintiff's diplopia as
severe and filed a URC request for the plaintiff to see the
strabismologist as soon as possible.  The URC approved this
request, instructing that the plaintiff be seen by the
strabismologist within one week.  The neuro-ophthalmologist's

office, however, scheduled the appointment for January 2013.  URC
personnel were informed that this was the first available adult
appointment and the neuro-ophthalmologist indicated that this was
acceptable. The plaintiff saw the strabismologist on January 23,
2013.  The strabismologist's notes of the visit indicate that
surgery could be performed if desired, but did not indicate that
surgery was a medical necessity.  The surgery center the
strabismologist used would not allow inmate patients.  The
plaintiff underwent surgery for his double vision with a
different strabismologist in April 2013.

III. <u>Discussion</u>

The defendants move for summary judgment on the grounds
that, as members of the URC, they did not provide inadequate
medical treatment and they are protected by qualified immunity.
The defendants also contend that defendant Wu was not a member of
the URC and, therefore, had no involvement in the decisions that
are the basis of the plaintiff's claims.

A.   <u>Personal Involvement of Dr. Wu</u>

The claims in this case are against the individual members
of the URC for decisions they made regarding the plaintiff's
medical care.  In the Initial Review Order, the court dismissed
the claims against the URC as a separate entity and directed the
plaintiff to file an amended complaint naming the individual

members of the URC.  See Doc. #4.

Dr. Wu was not a member of the panel during the time relevant to the plaintiff's claims.  See Doc. #33-4, Aff. of Syed Naqvi, ¶ 8.  In his memorandum in opposition to the motion for summary judgment, the plaintiff concedes that Dr. Wu did not deny him adequate medical care.  See Doc. #35 at 1.  As Dr. Wu was not involved in any of the URC decisions regarding the plaintiff's care that are at issue in this case, the defendants' motion for summary judgment is granted as to all claims against Dr. Wu.

B.  Deliberate Indifference to Serious Medical Needs

The defendants argue that defendants Ruiz, Naqvi and Farinella were not deliberately indifferent to any serious medical need of the plaintiff.

To successfully oppose the defendants' motion for summary judgment on his claim for deliberate indifferent to a serious medical need, the plaintiff must present evidence demonstrating sufficiently harmful acts or omissions and intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain by prison personnel.  See Estelle v. Gamble, 429 U.S. 97, 104-06 (1976).  There are both subjective and objective components to the deliberate indifference standard. See Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994). Objectively, the alleged deprivation must be "sufficiently serious."  Wilson v. Seiter, 501 U.S. 294, 298 (1991).  The

21

condition must be one that may produce death, degeneration or extreme pain. See Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)(internal quotation marks omitted). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. Salahuddin v. Goord, 467 F.3d 263, 280 (2d Cir. 2006). A difference of opinion regarding what constitutes an appropriate response and treatment does not constitute deliberate indifference to a serious medical need. See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998). Nor is negligence sufficient to establish deliberate indifference to a serious medical need. Id.

In his memorandum, the plaintiff states that a Dr. Norwood in New York told him about a year after his brain surgery that he needed additional surgery and recommended consultation with a specialist. The plaintiff has not provided any medical records to support this statement or to show that he was scheduled for a consultation after August 2009 while in New York. Thus, any argument that the URC failed to honor these recommendations is without merit.

The plaintiff also states that a doctor at the University of Connecticut Health Center told him that he would require additional surgery for his eye, throat and ear. The plaintiff states that the doctor submitted a recommendation for the surgery

in October 2011, but that the URC denied the request, purportedly because of budget issues.  Again, the plaintiff provides no information regarding this doctor or support for his statements. Without an affidavit from the doctor or a copy of the denial citing budgetary reasons, the plaintiff's statements are hearsay which is not admissible and cannot be used to oppose a motion for summary judgment.  See Fed. R. Civ. P. 56(c)(1) (requiring that a party cite to admissible evidence to show the existence of a genuine dispute over a factual issue).  The plaintiff also refers to four ENT doctors who purportedly told him he required throat surgery.  He neither identified these doctors nor provided any evidence to support his hearsay statements.

Dr. Naqvi has summarized all of the URC requests received regarding the plaintiff's care.  In October 2011 the URC denied a request for ocular surgery, as no evidence was presented to show that the plaintiff's vision was seriously affected and that surgery was a medical necessity.  The URC also denied two requests for strabismology consults for this same reason.  Once evidence that the plaintiff suffered serious diplopia (double vision) was presented to the URC, it approved consults with a strabismologist and neuro-ophthalmologist as well as ocular surgery.  The URC also approved every request submitted seeking an MRI of the plaintiff's brain or ENT consults.  There is no evidence of any request for surgery to address issues with the

23

plaintiff's throat or ear.

The plaintiff has provided no evidence in opposition to the motion for summary judgment suggesting that the URC members were subjectively indifferent to his care.  Even as his treating physician, Dr. Naqvi was unaware that the plaintiff suffered what he now characterizes as constant headaches.  The plaintiff told Dr. Naqvi that he experiences intermittent headaches in April 2010 and did not mention them again until November 2010.  Upon hearing the second complaint of headaches and after reviewing the plaintiff's New York medical records, which had finally arrived that month, Dr. Naqvi requested an MRI.  The URC granted this request.

The defendants state that the URC panel is not responsible for scheduling doctor visits and the plaintiff has provided no contrary evidence.  Thus, any claim regarding the length of time between the URC approval of the strabismology consult and the consult itself, or the time for any scheduled appointment, necessarily fails.

Absent evidence showing that the URC members were made aware of serious medical needs and disregarded those needs, the plaintiff fails to establish a claim for deliberate indifference to serious medical needs.  Consequently, the defendants' motion for summary judgment is granted as to the claims against Drs. Ruiz, Naqvi and Farinella.

24

IV.   <u>Conclusion</u>

The motion for summary judgment   [**Doc. #33**] is **GRANTED.**   The Clerk is directed to enter judgment in favor of the defendants and close this case.

**SO ORDERED** this 19th day of February 2014, at Hartford, Connecticut.

/s/ DJS
Dominic J. Squatrito
United States District Judge